OPINION
This appeal is taken by Appellant William Ogden from the judgment entered by the Court of Common Pleas of Union County denying Appellant's Motion to Intervene, Motion for Modification of Child Support and Visitation or in the alternative to Transfer to the Juvenile Division.
On July 29, 1995 Teresa Peake, now Teresa Weikle, (hereinafter "Weikle") and Christopher Peake (hereinafter "Peake") were married in Marysville, Ohio and on December 30, 1995, Weikle gave birth to Seth Michael Peake (hereinafter "Seth"). In December of 1997, after two years of marriage, Weikle filed for divorce. On April 11, 1998, the Court of Common Pleas of Union County entered judgment and issued a decree of divorce. The judgment decreed in part:
 "* * * Further, the court FINDS that one child has been born of the parties, namely Seth Michael Peake, DOB 12/30/95, and the parties agree that Christopher M. Peake is the child's father.
* * *
Christopher M. Peake is found to be the father of Seth Michael Peake.
* * *
 The Defendant shall pay to the Plaintiff as and for child support the sum of $80.87, per week which includes processing charge, for a total month child support obligation of $350.40."
The court also determined that Weikle was to be the residential parent of Seth and that parental rights and responsibilities including visitation were to be carried out according to the terms of the Shared Parenting Plan to which the parties had agreed prior to the divorce.
Sometime after the divorce Weikle informed William Ogden(hereinafter "Ogden") that he was Seth's natural father and thatshe had lied during the divorce proceedings when she said Peakewas Seth's natural father. After Weikle told Ogden that he wasSeth's father, she allowed Ogden to visit with Seth and even keephim for visitation overnight. Peake continued to pay childsupport regularly and he had custody of Seth once a week and everyother weekend.
On July 22, 1998, Ogden filed a complaint in the Union County Court of Common Pleas to establish the paternity of Seth. In the complaint Ogden claimed that he believed himself to be the biological father of Seth. He asked the Court to order a genetic test for the determination of paternity, and further, that if he be found to be Seth's biological father, for visitation pursuant to the laws of Ohio.
Following the filing of Ogden's complaint the Juvenile Courtasked the parties to submit briefs addressing the court'sjurisdiction to review the issue of Seth's paternity since thatissue had already been decided by the Domestic Relations Court.The Juvenile Court, after reviewing the brief filed by Weikle,found that it did have jurisdiction pursuant to the terms andconditions of R.C. 2151.23(B)(2).[1] The Juvenile Court thensustained Ogden's motion for genetic testing. Subsequently, thetest results indicated the probability that Ogden was the naturalfather of Seth Michael Peake is 99.88 percent (99.88%). TheJuvenile Court then entered an order of Child Support but refusedto enter an order for custody or visitation because visitation andcustody had been determined by the Domestic Relations Court in theprior divorce proceeding.
On June 15, 1999, in response to the findings of the Juvenile Court, Weikle filed a motion in the Court of Common Pleas Domestic Division for an order pursuant to R.C. § 3109.06 certifying the custody and support matters to the Juvenile Division. The motion was heard on July 6, 1999, before Magistrate Marcia Blackburn. At the hearing the following discussions occurred:
 The Court: Now, in looking at the documents that were most recently filed, evidently we have a gentleman by the name of William Ogden, who has filed a complaint alleging that he's the father, and basically, the Court went ahead and escrowed the child support, which I'm not quite sure how that happened, since there was an existing order on from this court, and the order was never overturned. There's been no Rule 60(B) motion filed to overturn that judgment, so I'm not quite sure how this child support was escrowed, since this order from this Court is still good. * * *
 I think the overriding consideration for this Court is what's in the best interest of the child. Mr. Peake, I'm going to ask you some very specific questions. That's my main concern. And I'm afraid if I certify it to Juvenile Court, that that court may terminate Mr. Peake's relationship with this child, or put another party into the relationship * * *
 Mr. Eufinger: Yes, if I may. Your Honor, one of the reasons that you don't see a 60(B) motion before you is because Mr. Peake has always accepted and wanted the responsibility of being the father of this child. He has, you know, paid his support. He has had his rights of companionship. He has had visitation. He has always considered himself to be the father. We were quite shocked, he was quite shocked when this action arose downstairs, and I do have to agree that we have been over this issue of res judicata. Clearly between the two of them its res judicata. We have no doubt about that.
 The court: Mr. Peake * * * now, when you had your divorce on this and I believe this was back in 19 — let's see when the decree was entered I believe it was April 11, 1998. Did you believe this child was yours the day of the hearing?
Mr. Peake: Yes.
 The Court: And you stated on the record that you thought this was your child?
 Mr. Peake: Right. There has always been a question whether or not he was for sure, but I've always treated him like he was my son, and take care of him.
 The Court: Okay. And how much visitation have you been having with him? How often do you see him?
 Mr. Peake: I see him every other weekend. I pick him up on Friday at 6:00 o'clock and I return him Sunday at 6:00, and then I get him Tuesday at 8:00, and I bring him back Wednesday at 7:00, so * *
* * *
 The court: Okay. Now, Miss Weikle I'm looking at all the affidavits that you signed, and there were numerous affidavits, so when you signed those affidavits, did you think that Mr. Peake was the father of your child?
Mrs. Weikle: No. We both knew that he wasn't four years ago.
The court: So basically you lied to the Court.
* * *
 The court: Did you know that at that time? Did you know that Mr. Ogden was in fact the father of your child?
Mrs. Weikle: Yes, I did, and so did he.
 The court: Okay. And at the divorce hearing you stated again to the Court that you felt that Mr. Peake was the father of Seth, right?
Mrs. Weikle: And I knew at the time he wasn't.
 The Court: Well, unfortunately, Mrs. Weikle I don't know what you're telling me is correct, or not, but it doesn't really matter, because at this time I'm looking at Seth, who is five, or almost five, and from the testimony that Mr. Peake has given to me, he feels that Mr. Peake is his father.
After the hearing the Magistrate issued her decision overruling the Motion to Certify Transfer to the Juvenile court. The Trial Court in its judgment entry dated August 12, 1999 adopted the Magistrate's decision. The decision is in part:
 "Plaintiff lied to this Court regarding the paternity of Seth Michael Peake. She now wants to disestablish Mr. Peake's paternity [of] Seth and establish William Ogden as Seth's father. This Court will not condone Plaintiff's "father shopping", her misrepresentations to the Court or her attempts to disestablish Mr. Peake's paternity of Seth Michael Peake."
Weikle did not appeal from that judgment. However, on November 5, 1999, Ogden, in response to the denial of the motion to certify transfer filed the following motions in the Domestic Relations court: Motion to Intervene, Motion for Modification of Child Support and Visitation or in the Alternative Motion to Transfer to the Juvenile Division.
The Domestic Relations Court scheduled a hearing for the motions on November 29, 1999 before Magistrate Marcia Blackburn. After a hearing the Magistrate issued her decision denying the motions based upon the reasoning set forth in the decision overruling Weikle's motion to Certify Transfer.
Ogden filed objections to the Magistrate's decision. Ogden argued that the Magistrate had erred when she focused on the fact that no Rule 60(B) motion to vacate the original order had been filed by Peake or Weikle, because Ogden was not a party to the original case, he had no standing to file a motion to vacate pursuant to Civ.R. 60(B). Therefore, he argued, the Magistrate's decision was based on an "inadequate application of law."
The Trial Court after hearing the objections scheduled another hearing so that additional evidence could be presented. On January 24, 2000, after hearing additional evidence, the trial court entered judgment affirming the decision of the Magistrate and overruling Ogden's motion to intervene. The judgment entry recites in part:
 The divorce case filed in the Union County Common Pleas Division of Domestic Relations was filed and concluded prior to the Juvenile Division filing by Ogden. Under the provisions of the Ohio Revised Code Section 3111.06(A) the Division of Domestic Relations has original jurisdiction in determining the parentage of the minor child involved in the divorce action. Without transfer of the cause to the Juvenile Division that Division is without jurisdiction to make determination of parentage, once original jurisdiction attached in the first instance. Consequently, this court holds that the judgment of the Juvenile Division is a nullity, as it applies to Weikle and Peake.
 As between Weikle and Peake, the determination of parentage in this Court is res judicata and will not be disturbed.
 Ogden is not a party to the divorce action and has no standing to request modification of support and/or visitation rights. In addition, he has not filed a Civ.R.60(B) motion.
 Therefore, this Court affirms the decision of the Magistrate by a determination that Ogden's various Motions should be, and are hereby Overruled. The Motion of Teresa Weikle to Reconsider is also overruled.
On appeal from that judgment Ogden asserts two assignments of error:
 The trial court erred to the prejudice of the Appellant in finding that the Appellant could not intervene in a domestic relations case when he was determined to be the biological parent.
 The court erred in failing to modify visitation and child support based upon a change of circumstances.
Ogden's first assignment of error claims that the trial court erred when it denied his motion to intervene in a domestic relations case to which he was originally not a party. Specifically, Ogden argues that because the Juvenile Division of the Common Pleas Court has established conclusively using genetic testing that Ogden is the father of Seth the judgment entered by the Domestic Relations Court in the divorce proceedings of Peake and Weikle finding Peake to be Seth's natural father is in error and he should be allowed to intervene.
Thus, the issue for decision is whether the trial court erred when it overruled Ogden's Motion to Intervene made pursuant to Civ.R.24(B).[2] Under Civ.R.24(B) a party may be permitted to intervene in an action if the application is timely and "(1) when a statute of this state confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common." Civ.R. 24(B) "In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." Civ.R. 24(B).
In reviewing the trial court's denial of a motion to intervene, the proper standard of review is whether the trial court's action constituted an abuse of discretion. Young v. Equitec Real EstateInv. Fund (1995), 100 Ohio App.3d 136, 138, 652 N.E.2d 235 [652 N.E.2d 234]; Widder and Widder v. Kutnick
(1996), 113 Ohio App.3d 616, 624, 681 N.E.2d 977. The term abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. State v. Adams (1980),62 Ohio St.2d 151, 157; Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219; Castlebrook, Ltd. v. Dayton Properties,Ltd. (1992), 78 Ohio App.3d 340, 346.
The record reveals that Ogden, after notification that the genetic test ordered by the Juvenile court indicated he was the father of Seth Michael Peake, filed a motion to intervene in the divorce proceedings adjudicated in the Domestic Relations Court almost two years earlier. In his motions Ogden prayed for either the right to intervene or the certification of transfer of the divorce to Juvenile Court so that he might be awarded visitation and further disestablish the paternity of Peake.
The record also discloses that the Domestic Relations Court held three hearings to consider the issue of Ogden's paternity following the entry of the divorce decree in April 1998. In the first hearing on Weikle's motion to certify transfer the court not only considered the prejudice to Peake's paternity and visitation that would result from transfer but also based its decision on the best interests of Seth. In the second hearing before the Magistrate on Ogden's various motions the Court again heard testimony concerning the best interests of the child and once again denied transfer based in part on the prejudice to the parties of the divorce that transfer or intervention would cause. The Magistrate also considered the following testimony elicited from Ogden:
By the court:
Q: Mr. Ogden, do you know Mrs. Peake?
A: Yes.
Q: Did you have sex?
A: Yes.
Q: Was it protected or unprotected sex?
A: No. Unprotected.
Q: Okay. How many times did you have sex with Mrs. Peake?
A: I don't know really, your Honor. A lot.
 Q: Okay. At this point, this Court is going to take judicial notice that when a man and woman have sex pregnancy may result. You never thought she may be pregnant?
 A: We were supposed to be we were young and stupid. It was a planned thing and it —
Q: So you planned to get her pregnant?
A: Yeah.
 Q: So you planned to get her pregnant? It never entered your head that she was pregnant?
 A: I knew she was pregnant. She was pregnant three or four months into the relationship and she left and said it was Mr. Peake's.
 Q: All right. My question to you is, if you knew that she was pregnant, a planned pregnancy, before this couple got divorced in April of 1998, why didn't you file a motion at that time?
A: Because I was told I wasn't the dad.
Q: You knew you had sex with her; right?
A: Yeah.
Q: And you planned to get her pregnant?
A: It was a planned thing. Yes.
At the third hearing before the trial court, the trial judge once again elicited testimony from Ogden, Weikle and Peake. The decisions issued by the Magistrate and the entries of the trial court reveal that this decision to overrule the initial Motion to Certify transfer and the Ogden's subsequent motion to intervene or in the alternative to certify transfer were reached only after reviewing hours of testimony, weighing the prejudices that may result to the parties of the original divorce and finally considering the best interests of the child, Seth.
Moreover, the trial court did recognize the fact that genetic testing had indeed indicated that Ogden was the natural father of Seth. However, the court also recognized that for five years Ogden had known that he was Seth's father. Ogden's testimony further revealed that he had intended to produce a child with Weikle during their sexual encounters. Further upon finding out Weikle was pregnant Ogden made no effort to assert paternity either upon birth of Seth or upon the divorce of Weikle and Peake.
The court also recognized the fact that Seth and Peake had formed a father and son relationship. Peake testified that he thought Seth was his son at the beginning of the marriage even though Weikle wasn't absolutely sure. In addition, Peake testified that he had no interest in disestablishing paternity as he considered himself to be Seth's father.
It must also be noted that several cases that are factually similar to the case sub judice, have been considered by the Supreme Court of Ohio. The Supreme Court has consistently placed finality above perfection especially in the area of parental rights.
 "We are not unaware that our decision in effect declares as static a state of facts that reliable scientific evidence contradicts. Nonetheless, there are compelling reasons that support such a decision. A claim under Civ.R. 60(B) requires the court to carefully consider the two conflicting principles of finality and perfection. In Knapp v. Knapp (1986), 24 Ohio St.3d 141, 144-145, 24 OBR 362, 364, 493 N.E.2d 1353, 1356, this court declared, `[f]inality requires that there be some end to every lawsuit, thus producing certainty in the law and public confidence in the system's ability to resolve disputes. Perfection requires that every case be litigated until a perfect result is achieved. For obvious reasons, courts have typically placed finality above perfection in the hierarchy of values.' Finality is particularly compelling in a case involving determinations of parentage, visitation and support of a minor child." Strack v. Pelton (1994), 70 Ohio St.3d 172, 175, 637 N.E.2d at 916.
Even though these cases focus on motions to vacate and disestablish parental rights pursuant to Civ.R. 60(B) this Court finds the principals upon which they are based to be indicative of the correct result to be achieved in the case sub judice.
Despite the authority in opposition to his attempt to disestablish Peake's paternity, Ogden argues that the Supreme Court did not intend for that line of cases to effect cases such as his. In support of his argument Ogden relies on CuyahogaSupport Enforcement Agency v. Guthrie (1999), 84 Ohio St.3d 437,442, 705 N.E.2d 318 where the Supreme Court stated:
 "In Strack we did not state nor did we intend to establish an absolute rule that Civ.R. 60(B)(2) was to have universal application in every situation where later tests are submitted to challenge a previous determination of paternity. Indeed to apply Strack in such a literal manner would leave little room for a court to consider all the interests involved in these types of cases, including the welfare of the minor child, and to balance all of the equities. Cuyahoga Support Enforcement Agency v. Guthrie (1999), 84 Ohio St.3d 437, 442, 705 N.E.2d 318
Ogden's reliance on this case is misplaced. The trial court did not blindly follow Strack. To the contrary, the trial court held hearings on the issue, carefully questioned each party, weighed the prejudices that may result if the case were transferred or if Ogden were allowed to intervene and finally, the trial court considered the best interests of the child, Seth Michael Peake, when reaching its decision to overrule Ogden's motion to intervene.
For these reasons, it has not been shown that the attitude of the trial court was unreasonable, arbitrary or unconscionable. Therefore, Ogden's first assignment of error is overruled.
It must be noted that this decision is not intended to and does not in anyway impinge upon the recent decision of this Court inLightner v. Perkins (June 27, 2000), Hardin County App. No. 6-99-11, unreported. In that case this Court held that pursuant to 3111.09(A)(1) a juvenile court must grant an evidentiary hearing upon a motion for genetic testing when such a motion is properly made by any party to the action. Id. at 2*. We did not decide that the court must grant the entire relief sought.
The record of the hearings before the Domestic Relations Division discloses that the Juvenile Court in the matter before us, in addition to granting a hearing on the motion for genetic testing, granted that motion and upon receipt of the result declared parentage and ordered support contradicting a prior order of the Domestic Division of the same Common Pleas Court regarding the child whose interests are presented. No appeal was taken from that order. Because we affirm the judgment of the Domestic Division which necessarily declared the conflicting orders of the Juvenile Division to be a nullity, we do not decide the jurisdictional issue thus resolved within that Common Pleas Court. We note in passing however, that in Perkins the Juvenile Court had continuing jurisdiction of the entire action when entering its orders following hearing, unlike the matter before us. Therefore, to the extent that we affirm the judgment of the trial court and overrule Ogden's first assignment of error we do so on the limited basis of the error assigned on appeal.
For the foregoing reasons and because the record does not reveal that any parties bound by the outstanding custody and support order of the Domestic Relations Division have sought modification of that order, Ogden's second assignment of error is overruled.
The judgment of the Court of Common Pleas of Union County is affirmed.
 _______________________________ BRYANT, J.
HADLEY, P.J., and WALTERS, J., concur.
[1] The issue of jurisdiction was not appealed and is presently not before us. In addition, the records of the proceedings in the Juvenile Court were not certified to this Court on Appeal. Therefore, we do not decide any issues pertaining to the jurisdiction of the Juvenile Court or of the actions taken by the Juvenile Court pursuant to the finding of jurisdiction.
[2] The Motion to Intervene was actually made pursuant to Civ.R.24(A) (intervention as of right) but Ogden stated at a hearing on the motion that he had made an error and actually meant to proceed under Civ.R.24 (B) (permissive intervention.)